GAYLE HOLDERER, APPELLANT/CROSS-RESPONDENT, *v.* AETNA CASUALTY AND SURETY COMPANY, RESPONDENT/CROSS-APPELLANT.

No. 28405

September 1, 1998

963 P.2d 459

[11]THE HONORABLE CLIFF YOUNG, Justice, did not participate in the decision of this matter.

[Rehearing granted in part December 2, 1998]

*Robert H. Perry, Ltd.,* Reno, for Appellant/Cross-Respondent.

*Hamilton & McMahon, Ltd.* and *Lynn Cresalia Thompson,* Reno, for Respondent/Cross-Appellant.

## OPINION

By the Court, ROSE, J.:

On December 24, 1992, appellant/cross-respondent Gayle Holderer was involved in an automobile accident on Mt. Rose Highway with another vehicle driven by Lester A. Smith. Holderer, who sustained injuries as a result of the accident, filed a civil complaint against Smith alleging that Smith's negligence caused the accident and her injuries. Holderer's underinsured

motorist insurance carrier, respondent/cross-appellant Aetna Casualty and Surety Company (Aetna), intervened as a defendant in order to ascertain Holderer's rights pursuant to her underinsured motorist policy. At the conclusion of trial, Holderer obtained a favorable jury verdict and was awarded $181,000.00 in damages. However, the jury found Holderer forty percent comparatively negligent and thus the district court reduced her damages to $108,600.00.

Holderer now appeals, arguing *inter alia* that the jury's apportionment of comparative fault was contrary to the evidence adduced at trial, prejudicial comments were made by the trial judge, and the district court erroneously admitted evidence of Holderer's alleged improper acquisition of prescription medications without permitting her witnesses to explain that there was no impropriety. We agree. Accordingly, we reverse the judgment below and remand for a new trial.

## FACTS

Just before 10:00 a.m., on December 24, 1992, Holderer was travelling eastbound on Mt. Rose Highway from her residence in Incline Village enroute to Reno. It had snowed the night before, leaving the roads wet and sandy. Holderer was travelling at or below the posted speed limit of forty-five miles per hour. Simultaneously, Smith, who was travelling north on Country Club Drive, approached the intersection of Mt. Rose Highway with the intent to make a left turn.

As Holderer approached the intersection of Mt. Rose Highway and Country Club Drive, she saw Smith's vehicle approach the intersection from the right on Country Club Drive. Smith's entry onto the Mt. Rose Highway was controlled by a stop sign. Smith's vehicle entered the intersection, crossing into Holderer's lane of travel. Holderer sounded her horn, but Smith's vehicle did not stop. Holderer applied the brakes and turned the wheels slightly to the left to avoid a collision. However, Holderer's wheels locked, sending her vehicle into a skid toward the center line of Mt. Rose Highway. Smith's vehicle continued moving across the highway, and Holderer's vehicle struck Smith's vehicle slightly across the center line.

Smith and his wife were severely injured in the collision and taken via CareFlight helicopter to Washoe Medical Center. Smith later stated that he never saw Holderer's vehicle and that he knew vehicles on Mt. Rose Highway had the right-of-way at the Country Club Drive intersection. Smith also stated that his field of vision along Mt. Rose Highway was blocked by four-foot snowbanks, so he slowly moved his vehicle forward past the stop sign for a better view. However, Smith said he did not see or hear Holderer's vehicle until the moment of impact.

Nevada Highway Patrol Trooper Mark Allen Zacha responded to the accident, arriving at 10:22 a.m. Trooper Zacha had previously received formal training in accident investigation and had also trained other officers in the field; he was the first law enforcement officer to arrive at the accident scene.

Trooper Zacha testified that three to four-foot high snowbanks were piled on either side of Mt. Rose Highway on the morning of December 24, 1992. However, Trooper Zacha also stated that the conditions were sunny and that there was no snow on the road twenty minutes after the accident. Trooper Zacha surmised that because of the obvious skid marks and the short time it took for him to respond, it was highly improbable that ice was on the road at the time of the collision. Trooper Zacha testified that there was no evidence "whatsoever" that Holderer was travelling in excess of the speed limit or that she did anything improper to have caused the accident.

On November 10, 1994, Holderer filed a civil complaint against Smith, alleging that Smith's negligence had proximately caused the accident and her injuries. Aetna, Holderer's underinsured motorist insurance carrier, intervened as a defendant in order to ascertain Holderer's rights pursuant to her underinsured motorist policy.

On December 11, 1995, during voir dire, the following colloquy took place between a potential juror and the district court judge.

THE COURT: . . . . Keeping in mind all of the questions asked, is there any juror who cannot be fair and impartial to both sides in this case, or all three sides, as a matter of fact?

Yes, Mr. Silsby?

MR. SILSBY: I'm not big on personal-injury attorneys. I'm sorry. I don't—

THE COURT: Well, you know, as a matter of fact, I'm not either.

Holderer's counsel did not object. The potential juror was subsequently excused because of his expressed bias toward personal injury attorneys.

After the completion of jury selection, the judge read certain procedural instructions to the jury. At one point, the judge stated, "You'll see me write notes. Occasionally I sign documents while I'm here, tomorrow morning stuff and that kind of thing. If you see me writing, don't take any special significance out of that because it could be my grocery list." Again, there was no objection from Holderer's or Aetna's counsel.

On December 11, 1995, the jury trial commenced. Immediately prior to the start of trial, Aetna's counsel handed

Holderer's counsel a check in the amount of $50,000.00 from Aetna. Aetna's counsel stated that the money was not conditional on Holderer's dismissal of any claims and that the money had "no strings attached."

During trial, and over Holderer's objections, the district court admitted testimonial evidence that showed Holderer had been receiving mental health counseling for several years for the treatment of anxiety attacks, obsessive compulsive disorder, panic disorder, and emotional problems. The district court also admitted evidence of Holderer's use of the prescription psychiatric medications Xanax and Dalmane. While Aetna's expert witness testified that Holderer's medications could have affected her reflex and reaction time, Holderer's treating physician testified that the prescriptions she took the night before the accident would not have adversely affected her reaction time or ability to drive a car the next day.

Additionally, the district court admitted pharmacy records of Holderer's prescriptions, but excluded certain testimony from pharmacist Karen Barb. Holderer proffered the testimony of Barb, who was the custodian of the pharmacy's prescription records, to rebut the inference raised by Aetna's cross-examination of Holderer's treating physician that Holderer had unlawfully obtained her prescription medications. The district court prevented Barb from testifying that Holderer's prescription refill request had come from the office of Holderer's treating physician and not from Holderer.

On December 15, 1995, the jury returned a verdict in favor of Holderer, awarding her $181,000.000 in damages. However, the jury also found Holderer forty percent comparatively negligent and thus the district court reduced her damages to $108,600.00.

On February 1, 1996, approximately one week after the entry of judgment, Aetna filed a motion to amend the judgment pursuant to NRCP 59(e).[1] Aetna argued that because Smith's insurance carrier was paying the first $100,000.00 of Holderer's damages, and Aetna had already tendered a check for $50,000.00 to Holderer, Aetna was thus entitled to receive a recoupment of approximately $42,000.00. Aetna alleged that the $50,000.00 check tendered before trial was intended as a good faith advance payment to Holderer in anticipation that the liability against Smith would exceed $100,000.00.

On May 29, 1996, the district court denied Aetna's NRCP 59(e) motion to amend the judgment. The district court found that

---

[1]NRCP 59(e) provides:

> Motion to Alter or Amend a Judgment. A motion to alter or amend the judgment shall be served not later than 10 days after service of written notice of entry of the judgment.

Aetna had failed to provide any primary authority for its requested relief, and concluded that had Aetna intended the $50,000.00 check to be an advance tender of Holderer's claim, "[Aetna] should have made that clear upon presentment."

Holderer now appeals from the jury's apportionment of fault, and Aetna cross-appeals from the district court's denial of its NRCP 59(e) motion.[2]

## DISCUSSION

*The district court judge made improper comments during trial*

Holderer first argues that the district court judge acted improperly when he expressed his negative feelings toward personal injury attorneys and by trivializing the proceedings by facetiously commenting that he could be writing his "grocery list" during trial. We agree.

When judicial misconduct occurs, normally it must be preserved for appellate review by an objection or motion for a mistrial. However, this court has held that the failure to object to a trial judge's conduct will not necessarily preclude judicial review when judicial deportment is of an inappropriate but nonegregious nature. Parodi v. Washoe Medical Ctr., 111 Nev. 365, 368, 892 P.2d 588, 591 (1995). In this case as in *Parodi,* lack of

---

[2]Aetna further argues on cross-appeal that the district court erred in awarding costs to Holderer and in denying its NRCP 59(e) motion to alter or amend the judgment. This motion sought recoupment of a portion of Aetna's tender of $50,000.00 in underinsured motorist benefits just prior to the commencement of trial. Because this matter is remanded for a new trial on liability and damages, the cross-appeal is moot. However, some comment on this issue is appropriate for guidance on remand.

With the tender, assuming that any judgment obtained exceeded $100,000.00, Holderer was, ostensibly, guaranteed a total of $150,000.00 in third-party and first-party insurance proceeds (the policy covering Lester Smith provided $100,000.00 in basic liability limits). Because the tender was made "with no strings attached," and because an ordinary person would reasonably conclude that the tender was unconditional, the district court properly refused the request for repayment of the difference between the net judgment of $108,600.00 and the total of Smith's $100,000.00 of liability coverage and Aetna's tender of $50,000.00. However, there is legitimate concern as to whether the tender, which was made pursuant to Pemberton v. Farmers Ins. Exchange, 109 Nev. 789, 858 P.2d 380 (1993), should be subject to repayment when the net recovery does not exceed the amount of the tender. On this point, we note that the unconditional "no strings attached" offer was a contractual payment entitling Aetna to an equitable set-off against any judgment obtained. Where such a tender ultimately exceeds the net judgment, the "no strings attached" nature of the payment precludes recoupment. However, under *Pemberton,* a conditional payment requiring recoupment would be evidence of good faith, although not determinative of the issue.

an objection should not preclude our review of this judicial misconduct.

In *Parodi,* we explained that judges can exert substantial influence upon jurors by their actions or words.

> The average juror is a layman; the average layman looks with most profound respect to the presiding judge; and the jury is, as a rule, alert to any remark that will indicate favor or disfavor on the part of the trial judge. Human opinion is ofttimes formed upon circumstances meager and insignificant in their outward appearance; and the words and utterances of a trial judge, sitting with a jury in attendance, are liable, however unintentional, to mold the opinion of the members of the jury to the extent that one or the other side of the controversy may be prejudiced or injured thereby.

*Id.* at 367-68, 892 P.2d at 589-90 (citations omitted). In *Parodi,* the same district court judge led the jury in a standing ovation when the appellants' counsel returned late from a court recess. Additionally, he joked about the jurors' solemn oath and made light of several matters that came up during voir dire.

While the errors in the instant case are less egregious than in *Parodi,* they still put Holderer's counsel in a poor light and trivialized the proceedings. Considered in isolation, the district court judge's comments may not have risen to the level of reversible error; however, reversal of this case is required when these errors are coupled with the other errors noted in this opinion.

*Holderer's alleged improper acquisition of prescription medications*

Both parties have vigorously contested the propriety of the district court's ruling limiting the pharmacist's testimony regarding the contents of the pharmacy's prescription record. Holderer attempted to proffer the pharmacist's testimony to rebut the inference, raised by Aetna's cross-examination of Holderer's treating physician, that Holderer had unlawfully obtained prescription medications. This evidence would have explained the pharmacist's records and informed the jury that the prescriptions in question were called in by Holderer's physician's office. The district court prohibited the pharmacist's testimony on hearsay grounds.

We decline to address the parties' specific hearsay arguments pertaining to the admissibility or inadmissibility of the pharmacist's testimony but instead conclude that evidence indicating Holderer may have improperly acquired prescription medications was error. Aetna's cross-examination of Holderer's treating physician, the thrust of which suggested that Holderer had unlawfully obtained her prescription medications, was of negligible relevance

in this personal injury case. Because of its marginal relevance and inflammatory nature, we conclude that the probative value of evidence pertaining to Holderer's alleged improper acquisition of prescription medication was substantially outweighed by the danger of unfair prejudice. *See* NRS 48.025; *cf.* Land Resources Dev. v. Kaiser Aetna, 100 Nev. 29, 34-35, 676 P.2d 235, 238 (1984) (concluding that the district court did not err in admitting evidence where the probative value of such evidence was not substantially outweighed by the danger of unfair prejudice).

Accordingly, on remand we instruct the district court to exclude all evidence suggesting that Holderer may have obtained her medication unlawfully.

*Insufficient evidence presented to establish causal connection between Holderer's prescription medication usage and the accident*

Holderer makes one additional point that we believe merits comment since this case will, in all probability, be retried. Holderer argues that her prescription medication usage should not have been received in evidence because there was no evidence of any impairment or inappropriate action on her part which indicated that her prescription medication usage contributed to the cause of the accident.[3] While her prescription medication usage should not have been admitted on the issue of liability because evidence of causation (i.e., how the medication usage contributed to the accident) was lacking and the probative value of such evidence was substantially outweighed by the danger of unfair prejudice, it was admissible as to Holderer's claim for future lost earnings—whether she could effectively perform as an attorney. However, this does illuminate the fact that there was insufficient evidence presented to establish the causal link between Holderer's prescription medication usage and the accident.

The evidence surrounding the accident and the conditions of the accident scene itself were not in dispute and indicated that Holderer's conduct was both lawful and reasonable. She was proceeding up the mountain on the main highway within the speed

---

[3]Holderer also argues that the district court erred in admitting evidence of her former SIIS claims, along with evidence that she had been partially supported by the man with whom she had been cohabiting. These arguments are not persuasive. Because of Holderer's past and present injuries involving her lower lumbar spine, we conclude that the brief reference to SIIS records reflecting Holderer's 1985 treatment for problems with her cervical spine was relevant. Likewise, evidence that Holderer had been supported by the man with whom she had cohabited was relevant to show her past earnings and work history. Accordingly, the district court did not err in admitting such evidence.

limit exercising the right-of-way. When Holderer noticed Smith pulling out from a side street in violation of a stop sign, she steered her vehicle to the left and forcefully applied the brakes. Smith could not refute these facts because he had no recollection of the accident. Trooper Zacha stated that there was no indication that Holderer did anything improper to cause the accident.

Aetna could not refute these facts except to emphasize Holderer's long term usage of sleeping pills and antidepressants and the fact that she took a strong dose the night before the accident. Holderer's treating physician testified that the prescriptions taken the night before the accident would not have affected her reaction time or ability to operate a motor vehicle the next day. Although Aetna's expert witness testified that Holderer's dosage of Xanax, which was the largest dosage of the antidepressant he had ever seen, could have affected her reaction time at the time of the accident, he did not explain the extent of the alleged impairment or how such impairment contributed to the accident. Other than speculating that Holderer's reactive abilities could have been affected, Aetna never demonstrated that Holderer's prescription medication use was a contributing cause of the accident.

The only evidence suggesting that Holderer was in any way impaired during the accident was the testimony offered by Aetna's expert witness indicating that she might have been under the influence of an antidepressant at the time of the accident. There was a complete lack of any further evidence establishing the extent of Holderer's alleged impairment or how the impairment caused or contributed to the accident.

Accordingly, due to a lack of evidence indicating Holderer's actual impairment or how her alleged impairment in any way contributed to the accident, and due to the improper admission of certain testimony, this matter must be remanded for a new trial on the issues of comparative negligence and damages.[4] *See* Kroeger Properties v. Silver State Title, 102 Nev. 112, 114, 715 P.2d 1328, 1330 (1986) (explaining that a new trial may be granted due to insufficient evidence where there is plain error or manifest injustice).

## CONCLUSION

We conclude that the district court judge's comments, in combination with the admission of evidence pertaining to Holderer's alleged improper acquisition of prescription medications, constituted reversible error.

---

[4]Because the inflammatory nature of the evidence that should have been excluded may have had an impact on the damage award, the jury on re-trial should be required to resolve anew the entirety of the liability and damage issues.

Accordingly, we reverse the judgment below and remand for a new trial consistent with this opinion.

SPRINGER, C. J., and SHEARING and YOUNG, JJ., concur.

MAUPIN, J., concurring:

While I agree entirely with the majority, I write separately to expand on the issue arising from the trial court's interaction with a prospective juror concerning "personal injury" attorneys.

In this day and age, derision of the legal profession has become standard fare. This is as unfortunate as it is unfair to almost every lawyer in this land. As we in the profession understand, lawyers perform vital functions in our democracy. Without lawyers doing their jobs every day in and out of the courtroom, protection of basic human rights and freedoms would literally disappear. This is so whether the attorney practices "personal injury" law, prosecutes criminal actions, defends persons accused of criminal misconduct, or engages in any other specialty of the law.

The trial judge below clearly intended to mollify the prospective juror and, without question, had no intent to prejudice Ms. Holderer's case. However, the remark did have the potential of re-enforcing an attitude based upon ignorance of the role attorneys' play in our society. In stating my absolute belief that this trial judge, a respected jurist of ability and integrity, shares my beliefs regarding the nobility of our profession, I wish to express my hope that this is the last time we have an opportunity to comment on such an issue.